Hearing Date:  July 9, 2013 at 10:00 a.m.
Objection Deadline:  July 2, 2013 at 4:00 p.m.

BECKER, GLYNN, MUFFLY, CHASSIN & HOSINSKI LLP
299 Park Avenue
New York, New York 10171
Telephone (212) 888-3033
Facsimile  (212) 888-0255
Chester B. Salomon
csalomon@beckerglynn.com
Alec P. Ostrow
aostrow@beckerglynn.com
Michael D. Margulies
mmargulies@beckerglynn.com

*Attorneys for Debtor and Debtor in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| QUAD-C FUNDING LLC.,[1] | : | Case No. 13-11725 (ALG) |
| Debtor. | : | |

----------------------------------------------------------x

**DEBTOR'S OPPOSITION TO MOTION BY CROSSROADS ABL, LLC**
**AND CROSSROADS FINANCIAL SERVICES, LLC (i) TO DISMISS**
**THE CHAPTER 11 CASE, OR ALTERNATIVELY, (ii) FOR**
**LIMITED RELIEF FROM THE AUTOMATIC STAY**

---

[1]  The Debtor's mailing address is c/o Canaras Capital Management LLC, 130 W. 42nd Street, Suite 1500, New York, New York 10036.  The last four digits of the Debtor's employer identification number are 9902.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ iii

Preliminary Statement ............................................................................................ 1

Background ............................................................................................................ 3

    The Debtor's Business ........................................................................................ 3

    The Debtor's Formation and Structure ............................................................... 3

    Events Precipitating the State Court Litigation .................................................... 8

    The State Court Litigation .................................................................................. 9

    The State Court Decision on Crossroads' Motion for a Preliminary
    Injunction ......................................................................................................... 10

    The Supersedeas Bond ..................................................................................... 11

    The Authorization to File for Bankruptcy .......................................................... 12

Argument .............................................................................................................. 13

    The Petition Was Authorized; Dismissal Should Be Denied ............................... 13

    State Law Governs the Issue of Authority to File Bankruptcy ............................. 15

    The Ordinary Burden of Proof Applies to this Motion; the Special
    Securities Law Rule Does Not ........................................................................... 16

    A Debtor's Authority to File Should Be Determined as of the Date
    of its Exercise .................................................................................................. 18

    The Sale to New Members Was In Accordance with the Governing
    Documents ....................................................................................................... 20

    Crossroads Received an Insider Preference; Stay Relief Should Be
    Denied ............................................................................................................. 23

    The Debtor Denies Crossroads' Other Factual Contentions ............................... 26

Conclusion ............................................................................................................ 27

Exhibit List ............................................................................................................ 28

## TABLE OF AUTHORITIES

### Cases

*Cordius Trust v. Kummerfeld (In re Kummerfeld)*,
    444 B.R. 28 (Bankr. S.D.N.Y. 2011).................................................................... 17, 18

*CPY Co. v. Ameriscribe Corp. (In re Chas. P, Young Co.)*,
    145 B.R. 131 (Bankr. S.D.N.Y. 1992)...................................................................... 24

*Elf Atochem N. Am., Inc. v. Jaffan*,
    727 A.2d 286 (Del. 1999) ......................................................................................... 15

*Grogan v. Garner*,
    498 U.S. 279 (1991)................................................................................................... 17

*Herman & MacLean v. Huddleston*,
    459 U.S. 375 (1983)................................................................................................... 17

*In re Am. Globus Corp.*,
    195 B.R. 263 (Bankr. S.D.N.Y. 1996)............................................................... 15, 22

*In re East End Dev., LLC*,
    2013 WL 1820182 (Bankr. E.D.N.Y. Apr. 30, 2013) ............................................. 15

*In re Global Aviation Holdings Inc.*,
    478 B.R. 142 (Bankr. E.D.N.Y. 2012)..................................................................... 24

*Johns-Manville Corp. v. Asbestos Litig. Grp. (In re Johns-Manville Corp.)*,
    26 B.R. 420 (Bankr. S.D.N.Y. 1983)....................................................................... 26

*Kaler v. Craig (In re Craig)*,
    144 F.3d 587 (8th Cir. 1998) ................................................................................... 26

*Nat'l Bank of Newport v. Nat'l Herkimer County Bank*,
    225 U.S. 178 (1912)............................................................................................ 25, 26

*Palmer Clay Prods. Co. v. Brown*,
    297 U.S. 227 (1936)................................................................................................... 25

*Price v. Gurney*,
    324 U.S. 100 (1945)................................................................................................... 15

*SEC v. Ralston Purina Co.*,
    346 U.S. 119 (1953)............................................................................................ 17, 18

*Thermoview Indus., Inc. v. Clemmens*,
    2008 WL 906221 (W.D. Ky. Mar. 31, 2008), *affirming on other grounds and
    reinstating* 358 B.R. 330 (Bankr. W.D. Ky. 2007)................................................. 26

*Windels Marx Lane & Mittendorf, LLP v. Source Enters, Inc. (In re Source Enters., Inc.)*,
    392 B.R. 541 (S.D.N.Y. 2008).................................................................................. 22

## Statutes

11 U.S.C. § 101(2) ................................................................................................ 24

11 U.S.C. § 101(31)(E) ......................................................................................... 24

11 U.S.C. § 101(31)(F) .......................................................................................... 24

11 U.S.C. § 101(32)(A) .......................................................................................... 25

11 U.S.C. § 101(54)(D) .......................................................................................... 25

11 U.S.C. § 327(e) .................................................................................................. 24

11 U.S.C. § 362(g) .................................................................................................. 17

11 U.S.C. § 547(b) .................................................................................................. 24

11 U.S.C. § 547(d) .................................................................................................. 26

## Rules

Fed. R. Bankr. P. 4003(c) ...................................................................................... 17

Fed. R. Bankr. P. 4005 ........................................................................................... 17

Fed. R. Bankr. P. 6001 ........................................................................................... 17

## Federal Regulations

17 C.F.R. § 203.508(a) ........................................................................................... 22

17 C.F.R. § 230.501(a) ..................................................................................... 16, 21

17 C.F.R. § 230.503 ................................................................................................ 21

## Law Review

Committee on Federal Regulation of Securities, ABA Section of Business Law, "Law of
   Private Placements (Non-Public Offerings) Not Entitled to Benefits of Safe Harbors –
   A Report," 66 Bus. Law. 85 (2010) ............................................................... 21, 22

The opposition of Quad-C Funding LLC ("Quad-C" or the "Debtor"), as debtor and

debtor in possession, by its attorneys, to the motion by Crossroads ABL, LLC and Crossroads

Financial Services, LLC (collectively, "Crossroads") (i) to dismiss the chapter 11 case under

Bankruptcy Code section 1112(b), or alternatively, (ii) for limited relief from the automatic stay,

respectfully sets forth and represents:

## Preliminary Statement

1.      Crossroads seeks dismissal of this bankruptcy case on the ground that the filing

was not authorized.  In making this Motion, Crossroads relies on a provision in the Debtor's

Operating Agreement that requires the consent of a Supermajority (62.5%) of the Common

Members, something that Crossroads contends cannot be obtained without its consent.  The

central problem with Crossroads' position is that additional Common Members were admitted in

2010 in accordance with a provision of the Operating Agreement that does not require

Crossroads' consent, and the votes of these additional Common Members contributed to the

Supermajority that authorized the filing.  Crossroads argues that the admission of these

additional Common Members was invalid, because the Debtor did not comply with the provision

that permitted their admission, and therefore, their votes should not be counted.  This argument is

based on a requirement that such admission must be in accordance with a Private Placement

Memorandum, which, in turn, requires that the new Members be "Accredited Investors" as

defined in SEC Rule 501.  Crossroads then alleges, without proof, that the new Members were

not "Accredited Investors."

2.      Crossroads tried this argument out once before, unsuccessfully, in a state court

litigation that it brought.  That litigation seeks, among other things, the dissolution of the Debtor.

Crossroads moved for a preliminary injunction directing the Debtor to cease business and begin

winding up its affairs.  In seeking such preliminary injunction, Crossroads argued that it had the right to compel dissolution under the Operating Agreement.  The Debtor opposed on the ground that such provision had been eliminated in an amendment that was authorized by a Supermajority including the additional Common Members.  Crossroads argued there, as is does here, that the admission of these new Members was invalid.  Crossroads lost that argument in state court.  The state court decision correctly construed the Operating Agreement, and held that the amendment that eliminated Crossroads dissolution trigger was properly authorized by a Supermajority vote including the new Members who were properly admitted.

3.      To raise the argument again, Crossroads relies on the procedural context in which it lost – a preliminary injunction – which is not a final ruling on the merits.  Nevertheless, the argument should not get a better reception in this Court on a motion to dismiss the bankruptcy case, because it is factually unsupported by Crossroads, and just plain wrong.  The Debtor did comply with the Operating Agreement and the Private Placement Memorandum and sold the Units to "Accredited Investors."  This Court should not use the procedural vehicle of a motion to dismiss the petition for lack of authority to file it to undertake a detailed examination of the credentials of the additional Common Members.  The Court should simply inquire whether the Debtor followed the proper procedure to sell Units to these additional Common Members whose votes authorized the filing.  Since the proper procedure was followed, this Court should hold that the requisite authority to file the petition was obtained.  The motion to dismiss should be denied.

4.      As alternative relief, Crossroads seeks limited relief from the automatic stay, principally to collect on a supersedeas bond posted by the Debtor, while the Debtor appealed an adverse ruling in the state court litigation that required it to advance Crossroads' litigation costs in that very litigation.  Secondarily, Crossroads seeks relief from the automatic stay to allow the

Appellate Division to rule on the Debtor's motion to appeal the affirmance by that court to the

state Court of Appeals.  The Debtor completely opposes relief on the supersedeas bond on the

ground that the posting of the bond, as to which the Debtor put up cash collateral for a letter of

credit that supports the bond, constitutes an indirect insider preference.  The Debtor does not

oppose allowing the state court appellate process to continue, but requests that the lifting of the

stay be deferred until the Debtor has retained appellate counsel.

**Background**

**The Debtor's Business**

5.      Quad-C is primarily engaged in making asset-based loans ("ABLs") to small

manufacturers, wholesalers and retailers.  An asset based loan is made with primary reliance on

the value of the collateral (the asset) and secondary reliance on the creditworthiness of the

borrower.  Quad-C's clients are typically small businesses that have difficulty accessing credit

markets.  The loans are typically small ($1.5 million or less) and because of the costs and risks

involved, the loan rates are high.  Quad-C's original business plan was to focus on two categories

of ABLs –purchase order and inventory loans.

**The Debtor's Formation and the Sale of Additional Units**

6.      Quad-C was formed in July 2010 by Lee Haskin, the sole member of Crossroads

Financial Services, LLC, a Florida company providing asset-based loans and other forms of

financing to small businesses, and a group including the principal of Canaras Capital

Management LLC ("Canaras"), a Delaware company specializing in the management of

alternative asset portfolios, and other individuals.  Two new entities, Crossroads ABL, LLC

("Crossroads ABL") and Saranac ABL, LLC ("Saranac"), were formed to become the initial

members of Quad-C.  During discussions that led to the formation of Quad-C, Crossroads

represented that it was a skilled originator and manager of ABL's and that it would bring a portfolio of $5-$10 million of existing loans to seed the Quad-C portfolio. Crossroads also promised to acquire 150,000 Common Units (at $1/unit) and 100 Preferred Units (at $1,000 per unit) to be an equal partner with Saranac. Just prior to the closing of the Common and Preferred Units, which were offered pursuant to a Confidential Private Placement Memorandum, Crossroads advised Saranac that it would reduce its investment to 100,000 Common Units and zero Preferred Units. Shortly thereafter, Crossroads advised Quad-C that its portfolio of loans had repaid and that it would not have any loans to seed Quad-C's portfolio.

7.    To memorialize the terms and conditions of their relationship, three separate agreements were executed. These agreements are: (a) a Limited Liability Company Operating Agreement of Quad-C Funding, LLC, effective as of July 20, 2010 (the "Operating Agreement"); (b) an Origination and Administrative Services Agreement between Quad-C and Crossroads (the "OASA" or "Servicing Agreement"); and (c) a Portfolio Management Agreement between Quad-C and Canaras. Under the Operating Agreement, Saranac was assigned day-to-day management responsibilities for Quad-C and responsibility for overseeing the services provided under the Servicing Agreement and the Portfolio Management Agreement. Fee payments for the service providers were specified in each of these agreements. With respect to this Motion, the Operating Agreement is most pertinent, and it is attached hereto as Exhibit A.[2]

8.    The Operating Agreement has the following relevant provisions:

(a) Section 6.4 lists actions that Quad-C may not undertake without a Supermajority (defined in Section 1.80 as 62.5%) of the Common Members. One such action is

---

[2] Copies of the other two agreements are attached as exhibits to the Debtor's Motion for Permission to Appear in New York State Court Litigation to Express Debtor's Views on Effect of Automatic Stay on Claims Against Non-Debtor Defendants, or Alternatively, for a Determination of Such Effect and, if Necessary, for an Extension of the Automatic Stay, dated June 24, 2013 (the "Debtor's Motion"), which is scheduled to be heard at the same time as Crossroads' Motion.

listed in Section 6.4.2, which provides in relevant part that without such authorization, the

Debtor may not engage in:

> 6.4.2  voluntarily liquidating or dissolving the Company except as contemplated by this Agreement or filing a voluntary petition by the Company pursuant to Chapter 7 or Chapter 11 of the Bankruptcy Code of 1978, as amended or failing to contest an involuntary petition under either Chapter or seeking the appointment of a receiver for all of its assets or making a general assignment for the benefit of creditors [.][3]

(b) Other relevant prohibitions listed in Section 6.4, prevents the Debtor, absent

Supermajority consent of the Common Members, from:

> 6.4.5  amending the Certificate of Formation or this Agreement, except as otherwise provided herein;

> 6.4.6  raising additional equity capital through the sale of Common Units or Preferred Units, pursuant to Section 3.3, except as provided in Section 3.3.4 [.]

(c) The reference in Section 6.4.6 to Section 3.3.4 is critical.  Section 3.3.4

provides:

> 3.3.4  Notwithstanding anything to the contrary contained in Section 3.3.2 [which deals with preemptive rights], the Manager may, from time to time, after the initial Capital Contribution from the Common Members of Two Hundred Fifty Thousand Dollars ($250,000) for Two Hundred Fifty Thousand (250,000) Units, in its sole discretion and without the consent of any Class, elect to raise up to an aggregate of (i) Two Hundred Thousand Dollars ($200,000) in additional equity capital for the Company through the sale of Common Units, and (ii) Five Million Dollars ($5,000,000) in additional equity capital for the Company through the sale of Preferred Units, in accordance with the private placement memorandum dated July 2010, as amended from time to time (the "Private Placement Memorandum") and, in connection therewith, admit one or more Common Members or Preferred Members at one or more Subsequent Closings and as consideration

---

[3]  Section 6.5.2 of the Operating Agreement contains a similar prohibition without the consent of a Majority-in-Interest (defined in Section 1.44 as more than 50%) of the Preferred Members.  The Debtor obtained such consent, and compliance with this provision is not at issue in the Motion.  In any event, Crossroads, which does not own any Preferred membership interests would lack standing to raise it.

therefore issue Common Units or Preferred Units to such new
Members.  For the avoidance of doubt, the issuance of Common
Units or Preferred Units at any Subsequent Closing pursuant to this
Section 3.3.4 shall not be subject to the preemptive rights
procedure set forth in Section 3.3.2.

9.      The Private Placement Memorandum or "PPM" referred to in Section 3.3.4 of the

Operating Agreement is attached hereto as Exhibit B.  For present purposes, the key feature of

the Private Placement Memorandum is the statement contained on page 51 that:  "The Company

will sell Units only to persons who qualify as 'Accredited Investors' under [SEC] Rule 501."

10.     Even before the Operating Agreement and the other documents were finalized,

Crossroads realized the significance of the Manager's ability to sell Common Units under

Section 3.3.4 of the Operating Agreement – it would enable a Supermajority to be obtained

without Crossroads' consent.  On July 16, 2010, counsel for Crossroads sent counsel for Canaras

a letter requesting certain changes to the Operating Agreement (the "July 16, 2010 Letter from

Crossroads' Counsel").  A copy of the July 16, 2010 Letter from Crossroads' Counsel (excluding

its exhibits) is attached hereto as Exhibit C.  It reads in pertinent part:

> As we understand the transaction now, with respect to Section 1.80
> (Supermajority) of the Operating Agreement, more than 62.5%
> vote is required.  Since there may be issued 50,000 more Common
> Units (See PPM) and an additional sale of $200,000 through the
> sale of Common Units (See Section 3.3.4 of the Operating
> Agreement, then Crossroads ABL may be diluted sufficiently that
> Canaras can meet the more than 62.5% voting requirement without
> Crossroad ABL's vote.

11.     The process for raising additional capital in accordance with Section 3.3.4 of the

Operating Agreement and the Private Placement Memorandum began soon after the launch of

the business.  On August 4, 2010, the Debtor filed an SEC Form D with regard to the proposed

sale of Units.  A copy of the Debtor's SEC Form D is attached hereto as Exhibit D.  The Debtor

then sent the Private Placement Memorandum together with a Subscription Booklet to

prospective purchasers of Units.  A copy of the Subscription Booklet is attached hereto as

Exhibit E.

12.     Part III of the Subscription Booklet is a Subscription Agreement to be executed

by the purchaser of the Units, defined therein as the "Investor," paragraph 6(a) of which contains

a representation and warranty, clause (w), by the Investor that "it is an accredited investor as

defined in Regulation D under the Securities Act," which includes Rule 501.  Part V of the

Subscription Booklet is a Subscriber Information Form Certification, which includes Exhibit A,

Subscriber Information Form for U.S. Investors.  Part A of this form is entitled "Subscriber

Information."  Significantly, Part B of this form is entitled "Subscriber Qualification," and part I

is entitled "Accredited Investor Status."  Completed Subscription Agreements, including

completed forms, were obtained from all purchasers of Units under the Private Placement

Memorandum.

13.     In the third quarter of 2010, Quad-C issued additional Common Units and

Preferred Units to new Members of Quad-C.   The new Members are identified on the Summary

of Quad-C Members and Ownership, which was attached as Schedule 4 to Exhibit A to the

Declaration of Richard D. Levinson in Support of the Debtor's Chapter 11 Petition and in

Accordance with Local Rule 1007-1, dated May 24, 2013.  A copy of this Summary of Quad-C

Members and Ownership is attached hereto as Exhibit F.  With the addition of the new Members,

Crossroads lost its ability to independently block any action requiring approval of a

Supermajority of Common Unit Members.[4]

---

[4]  The Summary of Quad-C Members and Ownership (Exhibit F) contains an error in Saranac's holdings.  The Dollar Amount of Common Shares should be $150,000 and the Percentage Ownership of Common Shares should be 54.75%.  Substituting this percentage, the totals of the Percentage Ownership of Common Shares of Saranac (54.75%), Crossroads (36.50%) and the PPM Subscribers (8.75%) add to 100.00%.

**Events Precipitating the State Court Litigation**

14.     The Operating Agreement gave the original Members, Crossroads ABL and
Saranac, the right to dissolve the Company within thirty days of specified "Liquidating
Triggers."  Operating Agreement § 13.1(5)-(6).  One such event was Quad-C's failure to meet
certain "benchmark tests" based on its capital or outstanding ABLs on certain specified dates.
*Id.* § 1.27 (definition of "Crossroads Liquidating Trigger").

15.     On April 5, 2011, Saranac, as manager of Quad-C, proposed an amendment to the
Operating Agreement to, *inter alia*, eliminate the dissolution options triggered by "Liquidating
Triggers."  Saranac advised the Members that the liquidation provisions raised a significant
barrier to raising term financing for Quad-C because lenders and investors were reluctant to
commit to a business that could be liquidated at any time. The amendments were approved by
the requisite supermajority of the Common Unit Members, effective April 13, 2011.  Crossroads
opposed the amendment.

16.     After receiving a draft of the April 5, 2011 notice, Lee Haskin, Crossroads'
Managing Member, notified the Debtor of Crossroad's intent to exercise its dissolution rights,
but this notice was not served in accordance with the terms set forth in the Operating Agreement.

17.     At least one day prior to sending this notice, Crossroads had begun surreptitiously
directing Quad-C's borrowers to remit their loan principal and interest payments  (the
"Repayment Proceeds") to a bank account owned solely by Crossroads and over which Quad-C
had no knowledge, ownership, authority or control.  Quad-C did not learn about these diversions
until Crossroads notified it, on April 29, 2011, that it was "withholding" $540,000 of loan
proceeds as "security" to cover service fees allegedly owed to Crossroads and debts to unnamed

third-party vendors.  In fact, by May 23, 2011, Crossroads had diverted approximately $700,000

of Repayment Proceeds.

18.     On May 2, 2011, the OASA with Crossroads was terminated and the duties under

that contract were assumed by Canaras Services LLC, a subsidiary of Canaras Capital

Management LLC.  Over the subsequent two years, Quad-C incurred approximately $1 million

of legal costs and a substantial negative carry between its earnings on large cash balances and the

cost of the debt.  During that time, Quad-C also sought to work out three sizeable loans made by

Crossroads for Quad-C that went into default.  Canaras achieved full recoveries on two of the

loans, but was unsuccessful in working out the third loan (a lawsuit is pending in federal court in

California attempting to recover some of the losses in connection with this loan), which resulted

in a loss of approximately $1.3 million.

**The State Court Litigation**[5]

19.     On or about May 10, 2011—more than one month after Crossroads began

diverting funds from Quad-C—Crossroads sued Canaras, Saranac, the members of Saranac,

Quad-C, and the holders of Quad-C's Preferred Units, commencing the State Court Litigation.

The Complaint sought to invalidate the amendments to the Operating Agreement and require

Quad-C to wind up its affairs and liquidate its assets.  It also alleged breach of contract and fraud

based upon the Operating Agreement and associated rights.  The Complaint was amended on

December 30, 2011.

20.     Nine days after the filing of the initial Complaint, the Defendants filed their

Answer, denying the material allegations and asserting various affirmative defenses.  Quad-C

---

[5]  Much of the recitation in this section is substantially the same as that contained in the Debtor's Motion, which is
scheduled to be heard at the same time as Crossroads' Motion.  Copies of the pleadings and state court decisions that
are mentioned herein, but are not attached as exhibits, are attached as exhibits to the Debtor's Motion.

also asserted five counterclaims against Crossroads for the diversion of the Repayment Proceeds. After the filing of the First Amended Complaint, the Defendants filed their Verified Answer to the First Amended Complaint and Counterclaims, dated February 8, 2012.

21.    Shortly after filing the initial Answer, on or about May 20, 2011, Quad-C immediately moved for a preliminary injunction to prevent Crossroads from further accessing or spending the Repayment Proceeds.  By Decision and Order, dated June 3, 2011, the Hon. Bernard Fried, Justice of the Supreme Court, granted Quad-C's application, enjoining Plaintiffs "from accessing any account in which the Repayment Proceeds are deposited."  In granting the injunction, the trial court found that Quad-C had shown a likelihood of success on the merits of its claims for breach of contract and conversion.  Crossroads ultimately agreed to deposit approximately $420,000 of Repayment Proceeds with the New York State Supreme Court.

**The State Court Decision on Crossroads' Motion for a Preliminary Injunction**

22.    On June 22, 2011, Crossroads moved by order to show cause, *inter alia*, to vacate the injunction against it and to compel Quad-C to honor its Notice of Dissolution and begin winding up the company.  By Order and Decision dated November 2, 2011, Justice Fried rejected Crossroads' requests, holding that Crossroads was unlikely to succeed on its challenges to the validity of the 2010 sale of additional Common and Preferred Units and to the subsequent amendments to the Operating Agreement.  A copy of the Order and Decision of November 2, 2011 is attached hereto as Exhibit G.

23.    In seeking such preliminary injunction, Crossroads argued that it had the right to compel dissolution under the Operating Agreement.  The Debtor opposed on the ground that such provision had been eliminated in an amendment that was authorized by a Supermajority including the additional Common Members.  Crossroads argued there, as it does here, that the

admission of these new Members was invalid.  The Order and Decision of November 2, 2011

held that the amendment that eliminated Crossroads' dissolution trigger was properly authorized

by a Supermajority vote including the new Members who were properly admitted.

24.     In the Order and Decision of November 2, 2011, the State Court meticulously

analyzed the provisions of the Operating Agreement governing the sale of additional Units,

especially Section 3.3.4, which permitted sales without Crossroads' consent. The analysis of the

State Court on pages 10 through 18 of the Order and Decision of November 2, 2011, is too

lengthy to quote here.  The Debtor respectfully submits that this analysis is thorough and correct,

and that there is no need for it to be revisited by this Court.

**The Supersedeas Bond**[6]

25.     On February 10, 2012, Crossroads moved for partial summary judgment on the

fifth cause of action in the First Amended Complaint to compel Quad-C to advance its legal fees

in the State Court Litigation, allegedly pursuant to paragraph 8(b)(ii) of the OASA.  Despite

Quad-C's vigorous opposition, in a Decision and Order, dated June 11, 2012, Hon. Bernard J.

Fried, Justice of the Supreme Court, granted Crossroads' motion.

26.     In December 2012, Quad-C was compelled to file a supersedeas bond to prevent

enforcement proceedings while Quad-C appealed the Decision and Order of June 11 to the

Appellate Division, First Department.  Quad-C has bonded $900,000, secured by a $1 million

letter of credit, against this obligation.  The letter of credit, issued by Signature Bank, was

collateralized by approximately $1 million of the Debtor's cash, which is in a restricted account

at Signature Bank.  The supersedeas bond was issued on December 12, 2012.  At the time the

---

[6] Copies of the decisions and the supersedeas bond referred to in this section are attached as exhibits to Crossroads'
Motion papers.

bond was posted, the Debtor was insolvent.  A copy of a pro forma balance sheet as of November 30, 2012, is attached hereto as Exhibit H.

27.     On April 23, 2013, the Appellate Division affirmed the Decision and Order of June 11, 2012.  Subsequent to the Appellate Division Decision and prior to the Petition Date, Crossroads demanded an increase in the bond based on a claim that covered attorneys' fees are now approximate $950,000.[7]

## The Authorization to File for Bankruptcy

28.     Following the affirmance by the Appellate Division, the Debtor attempted to settle with Crossroads to avoid a bankruptcy filing.  This attempt was unsuccessful.  While settlement negotiations proceeded, the Debtor obtained the authorization to file for chapter 11.

29.     On May 20, 2013, Saranac, as Manager of the Debtor, sent a notice, pursuant to Section 6.6 of the Operating Agreement convening a meeting of the Members on May 22, 2013 to conduct business, including the authorization of a chapter 11 petition.  A copy of the Member Meeting Notice is attached hereto as Exhibit I.

30.     The meeting was held on May 22, 2013.  Richard Levinson representing Saranac ABL LLC, the holder of 100 Preferred Units and 151,000 Common Units, attended in person. Two members, Simon P Airey (via phone) representing Sage Group Limited, the holder of 250 Preferred Units and 2500 Common Units, and Richard Bentley (via phone), an individual holding 150 Preferred Units and 1500 Common Units, attended by telephone.  The following members provided proxies to Saranac ABL to represent them at the Members' Meeting:

---

[7] The certainty that such fees would continue to rise and be funded by Quad-C during the pendency of the State Court Litigation, which, as of the Petition Date, was still in the discovery phase, was one of the precipitating factors of Quad-C's chapter 11 filing.  The combination of the liability to advance Crossroads' legal fees and the loan loss caused Quad-C's liabilities to exceed its assets.  The Debtor contends that posting the bond and securing the same by a letter of credit gives rise to an avoidable insider preference to Crossroads.

| Member | Preferred Units Held | Common Units Held |
|---|---|---|
| Belfar Securities | 500 | 5,000 |
| Bates, S. | 50 | 500 |
| Clemente, Catherine | 44 | 440 |
| Clemente, Peter | 10 | 100 |
| Clemente, Stephen | 138 | 1,380 |
| Kroon, P.J. | 250 | 2,500 |
| Kulikowski, F. | 300 | 3,000 |
| Levinson, Jordan | 125 | 2,500 |
| Levinson, Justin | 125 | 2,500 |
| Levinson, Richard | 250 | 0 |
| Mingo, Ryan | 15 | 150 |
| Phair, Carol | 39.6 | 400 |
| Steger | 50 | 500 |

The Members in attendance or represented by proxy constituted 100% of the Preferred Units and 63.5% of the Common Units outstanding.

31.    At the meeting, the resolutions presented were unanimously approved.  A certificate of these resolutions was attached to the voluntary chapter 11 petition, and is attached hereto as Exhibit J.  The petition was filed with this Court on May 24, 2012.

## Argument

### The Petition Was Authorized; Dismissal Should Be Denied

32.    Crossroads argues that the petition was unauthorized, because Crossroads did not approve it.  This argument is premised upon Crossroads' contention that the 2010 sale of additional units by Saranac was invalid.  This sale, which was contemplated in all discussions and negotiations between the founding members, included Common Units, and diluted the founding members' percentage ownership of Quad-C.  Because Crossroads had voluntarily reduced its investment in Quad-C Common Units from the level contemplated during the negotiations, this dilution eliminated Crossroads' ability to block any action requiring a

supermajority of the Common Units.  Crossroads acknowledges that the State Court rejected this

argument on Crossroads' motion for a preliminary injunction on the grounds that Crossroads

could not establish the likelihood of its success on the merits.  Nevertheless, Crossroads relies on

the preliminary nature of such determination.  Since the argument was not finally rejected on the

merits, it is still technically alive, and Crossroads urges this Court to adopt it.  This Court should

refuse to do so for several reasons.

33.    First, as a matter of fact, Crossroads' knew of the possibility, if not the likelihood,

that a sale of Units would result in its loss of the ability to block a Supermajority majority vote.

As the July 16, 2010 Letter from Crossroads' Counsel (Exhibit C) states:

> As we understand the transaction now, with respect to Section 1.80
> (Supermajority) of the Operating Agreement, more than 62.5%
> vote is required.  Since there may be issued 50,000 more Common
> Units (See PPM) and an additional sale of $200,000 through the
> sale of Common Units (See Section 3.3.4 of the Operating
> Agreement, then Crossroads ABL may be diluted sufficiently that
> Canaras can meet the more than 62.5% voting requirement without
> Crossroad ABL's vote.

Thus, even before the Debtor was launched, Crossroads knew that it stood to lose its

Supermajority blocking power.  This is exactly what occurred.

34.    The second reason to reject Crossroads' argument is that, Crossroads adduces no

evidence to support its allegation that the sale of Units was invalid.  Instead, Crossroads insists

incorrectly that the Debtor bears the burden to establish the proper credentials of all new

Members who purchased these Units and who voted to authorize the bankruptcy filing.  This

misguided attempt to shift the burden of proof means that Crossroads is left with nothing more

than unproven allegations.

35.    The third reason to reject the argument is that it improperly seeks to go past the

simple question of requisite authority to file the petition and probe into the legitimacy of the

credentials of those who voted in favor of the filing.  This Court need not and should not conduct

an inquiry into the status of each new Member and the right of such new Member to vote.  The

status quo at the time of the filing, as established by the State Court ruling, is that the new

Members' votes in authorizing an amendment to the Operating Agreement must be viewed as

proper.  That rationale applies equally to the new Members votes in authorizing the bankruptcy

petition.

36.     Finally, Crossroads' argument should be rejected because it is factually wrong.  If

necessary, the Debtor will establish in an evidentiary hearing that at the time of the filing of the

petition, the new members, whose money was actually received by the Debtor, were entitled to

have their votes in favor of the petition counted.  What permeates all these reasons is that, on the

merits, the State Court got it right; the Operating Agreement and the Private Placement

Memorandum plainly authorized the 2010 sale.  The votes of these new Members authorized the

petition.

**State Law Governs the Issue of Authority to File Bankruptcy**

37.     State law governs whether a business entity is authorized to file a bankruptcy

petition.  *In re East End Dev., LLC*, 2013 WL 1820182 at *4 (Bankr. E.D.N.Y. Apr. 30, 2013);

*see Price v. Gurney*, 324 U.S. 100, 106 (1945); *In re Am. Globus Corp.*, 195 B.R. 263, 265

(Bankr. S.D.N.Y. 1996).  For a Delaware limited liability company, that authority is set forth in

its operating agreement.  *Elf Atochem N. Am., Inc. v. Jaffan*, 727 A.2d 286, 291 (Del. 1999); *see

also East End Dev.*, 2013 WL 1820182 at *4 (construing New York law).  The relevant

provisions of the Debtor's Operating Agreement require a Supermajority (62.5%) of the

Common Units and a Majority-in-Interest of the Preferred Units for the filing of a bankruptcy

petition.  Operating Agreement §§ 6.4.2, 6.5.2.  Quad-C satisfied these requirements by the votes

of existing Common and Preferred Members, but Crossroads alleges that these votes do not count, because it contends that the Members admitted pursuant to the 2010 sale of Units were not properly admitted.

38.    Crossroads recognizes that the Operating Agreement granted Saranac the ability to sell units without Crossroads' consent in accordance with the Private Placement Memorandum.  Operating Agreement § 3.3.4.  This is what Saranac did in the 2010 sale, and the Members admitted pursuant to the 2010 sale voted to authorize the chapter 11 filing.  Crossroads nevertheless argues that this sale was not conducted in accordance with the Private Placement Memorandum, because the Private Placement Memorandum states that "[t]he Company will sell Units only to persons who qualify as 'Accredited Investors' under Rule 501."[8]  Private Placement Memorandum at 51.  At bottom, Crossroads argues that Saranac sold Units to persons who were not "Accredited Investors" under Rule 501.

39.    Crossroads offers no proof to support this allegation.  Rather, Crossroads argues that Quad-C has not proved that it sold Units to "Accredited Investors."  Thus, Crossroads argument boils down to this:  The petition is unauthorized because it was voted on by Members improperly admitted because Quad-C has not proved that these new Members were "Accredited Investors."  It is respectfully submitted that this argument falls far short of demonstrating the lack of authority for the bankruptcy filing.

**The Ordinary Burden of Proof Applies to this Motion;
the Special Securities Law Rule Does Not.**

40.    First, as the moving party, Crossroads bears the burden of proof to establish its central allegations – lack of authority to file for bankruptcy, based on the failure to comply with

---

[8]  17 C.F.R. § 230.501(a) (definition of "accredited investor" under Regulation D – Rules Governing the Limited Offer and Sale of Securities Without Registration Under the Securities Act of 1933).

the Operating Agreement.  Since the Bankruptcy Code is silent on the burden of proof on a

motion to dismiss a bankruptcy case, the party seeking such relief bears the burden to establish

its entitlement to relief by the preponderance of the evidence.  *See Grogan v. Garner*, 498 U.S.

279, 286 (1991) (employing standard civil burden of proof in bankruptcy matters when the

Bankruptcy Code is silent on the subject of the burden of proof); *Herman & MacLean v.

Huddleston*, 459 U.S. 375, 387 (1983) ("In a typical civil suit for money damages, plaintiffs must

prove their case by a preponderance of the evidence."). The Bankruptcy Code and Rules do

contain certain provisions that shift or regulate the burden of proof in some disputes.  *See* 11

U.S.C. § 362(g) (automatic stay relief); Fed. R. Bankr. P. 4003(c) (exemptions), 4005 (objection

to discharge), 6001 (validity of postpetition transfer).  No such provision in the Code or Rules

exists with respect to a motion to dismiss a bankruptcy case.

41.    Crossroads' attempt to place the burden of proof on the Debtor to demonstrate

that the new Members are "Accredited Investors" is misguided.  Crossroads relies on cases under

the securities laws for the proposition that one claiming an exemption from the requirement to

register securities has the burden to establish the exemption.  Crossroads' principal case, the

seminal case of *SEC v. Ralston Purina Co.*, 346 U.S. 119, 126 (1953), is an SEC enforcement

action to enjoin the sale of unregistered securities.  Crossroads' secondary case, *Cordius Trust v.

Kummerfeld (In re Kummerfeld)*, 444 B.R. 28, 45 (Bankr. S.D.N.Y. 2011), is a

nondischargeability action where the underlying debt was for alleged securities fraud based on

the sale of unregistered securities.  In both cases, a central issue was whether the securities laws

had been violated, and the securities laws themselves provided the rule of decision.[9]  That is not

---

[9] It should be noted that in neither case did the issuer file an SEC Form D, as the Debtor in this case.  *Ralston Purina*
pre-dated SEC Regulation D, and the *Kummerfeld* court mentioned that the issuer had not filed a Form D, 444 B.R.
at 45.

the issue presented here. Here, the issue is authority under state law of a business entity to file a

bankruptcy petition. Since, as set forth above, that authority is contained in the Operating

Agreement, the governing principles are those of contract interpretation, not the securities laws.

42.     The State Court recognized this when it rejected Crossroads' motion for a

preliminary injunction to compel Quad-C to wind-up its affairs. Crossroads sought this relief

based on its right to force a dissolution under the Operating Agreement prior to its amendment.

Crossroads asserted that the amendment that eliminated this right was invalid, because it was not

approved by a proper Supermajority, since the new Members who voted for it were not properly

admitted. Crossroads argued there, as it does here, that Saranac did not comply with the

Operating Agreement in selling Units to new Members, because such sales were required to be in

accordance with the Private Placement Memorandum, and they allegedly were not. The State

Court rejected this argument without the need to construe the securities laws. To the State Court,

the resolution of the motion for a preliminary injunction was a simple matter of contract

interpretation. It is the same for this Motion as well.

43.     Consequently, there is no basis to deviate from the ordinary rules governing the

burden of proof. Crossroads does not satisfy that burden by making an allegation that the new

Members are not "Accredited Investors" when that allegation is unsupported by proof.

**A Debtor's Authority to File Should Be Determined as of the Date of its Exercise**

44.     It is a matter of logic that whether the filing of a bankruptcy petition was properly

authorized should be determined as of the date the authority was granted.[10] The best indication

---

[10] The following hypothetical provides an illustration: Suppose that the Debtor were a corporation and its petition
had been authorized by a vote of its board of directors. Suppose that a shareholder seeks dismissal of the petition on
the ground that the members of the board of directors were not properly elected to their positions because of some
alleged defect in the corporate election process. The shareholder cannot carry its burden of proof to obtain dismissal
of the case by asserting that it is the Debtor's burden to demonstrate that each board member who voted to authorize
the bankruptcy filing was validly elected.

of whether the votes of the new Members should be counted is the State Court decision rejecting

Crossroads' motion for a preliminary injunction.  Crossroads sought to compel the Debtor to

refrain from engaging in any business other than winding up its affairs.  Crossroads sought the

enforcement of a provision in the original Operating Agreement, prior to its amendment, which

gave it the right to dissolve the Debtor upon the occurrence of a Crossroads Liquidating Trigger.

The Debtor opposed on the ground that this right had been removed by the amendment, which

was approved with the votes of new Members that had been admitted pursuant to a provision of

the Operating Agreement that allowed Saranac to sell certain Units without Crossroads' approval

in accordance with the Private Placement Memorandum.  The issue before the State Court then is

the same as the issue before this Court now – the propriety of the 2010 sale of Units that led to

the admission of new Members whose votes supplied the requisite Supermajority of the

Common Members.

45.    What is critical is the starting point of the State Court's analysis:

> I turn, first, to that part of the motion seeking a preliminary injunction which would enjoin all Defendants from implementing the purported dilution of Crossroads ABL's membership interest in Quad-C, and seeking a declaration that the purported First Amendment to the Operating Agreement is void, and that Crossroads' Notice of Dissolution is valid.

> *    *    *    *    *    *    *

> The injunction sought here is not one that preserves the status quo, but rather, which seeks to return to the parties to the status quo *ante*, and which, in fact, provides Crossroads with some of the ultimate relief sought by this action: the undoing of the First Amendment to the Operating Agreement and the dissolution of the Quad-C joint venture.

Order and Decision of November 2, 2011 (Exhibit G), at 9-10.

46.     Thus, the State Court determined that Crossroads' preliminary injunction motion sought not to preserve the status quo, which has the new Members who voted to approve the First Amendment, but rather to turn back the clock.  The State Court refused to grant the preliminary injunction.  That left the parties with the status quo as the State Court found it, with the new Members and the amendment to the Operating Agreement in place.

47.     That is the state of affairs as of the time of the authorization to file the chapter 11 petition.  In determining whether the petition was authorized, this Court should similarly not grant Crossroads the relief sought in its action and invalidate the 2010 sale, but rather take as given the status quo of the membership in the Debtor.  Crossroads should not be allowed to turn the simple question of whether Quad-C had the requisite authority to file the petition into an inquisition addressing the legitimacy of the credentials of those who voted in favor of the filing. The status quo at the time of the filing, as established by the State Court ruling, is that the new Members' votes in authorizing an amendment to the Operating Agreement must be viewed as proper.

**The Sale to New Members Was In Accordance with the Governing Documents**

48.     Despite Crossroads' contention, the Units at issue were sold in accordance with the Private Placement Memorandum, following the recommendations of securities counsel. First, it is clear that the Operating Agreement gave Saranac the ability to sell Units, including Common membership interests, in accordance with the Private Placement Memorandum.  The State Court ruling, although preliminary, is thorough and recognizes this ability. Order and Decision of November 2, 2011 (Exhibit G), at 10-18.  Moreover, it is based solely on the interpretation of the Operating Agreement, rather than any preliminary extrinsic evidence, and

therefore is entitled to great weight.  There is no reason for this Court to depart from the reasoning of the State Court ruling on this critical issue.

49.     Second, besides having the contractual authority, the prescriptions of the contract were actually complied with.  The Debtor filed a Form D[11] with the SEC in August 2010 (Exhibit D) in advance of the sale.  The Debtor then required that those purchasing Units to sign the subscription documents (Exhibit E), which contain representations on their satisfaction of the requirements for "Accredited Investors."  Significantly, the definition of "Accredited Investor" in Rule 501 not only means persons who come within the enumerated categories, it also means any person "who the issuer reasonably believes comes within any of the following categories, at the time of the sale of securities to that person."  17 C.F.R. § 230.501(a).  In the enumerated categories for individuals there are alternative tests of more than $200,000 of annual income (or $300,000  together with a spouse), or more than $1 million of net worth together with a spouse.  *See id.* § 230.501(a)(5)-(6).  Other "Accredited Investors" include certain corporations, partnerships and trusts with net worth in excess of $5 million, not formed for the purpose of acquiring securities, and entities all of whose equity holders themselves qualify.  *See id.* § 230.501(a)(3), (7)-(8).  At the time of the sale of the Units, the Debtor obtained the signed subscription documents containing the representations to demonstrate satisfaction of these requirements from all the new Members.  The Debtor did not investigate the accuracy of the representations provided by investors, but that is not required.  The issuer's reasonable belief that the purchasers are "Accredited Investors" is all that is necessary.  *Id.* § 230.501(a).  *See generally,* Committee on Federal Regulation of Securities, ABA Section of Business Law, "Law of Private Placements (Non-Public Offerings) Not Entitled to Benefits of Safe Harbors – A

---

[11]  *See* 17 C.F.R. § 230.503.

Report," 66 Bus. Law. 85, 98, 110 & nn. 71-73 (2010) (hereinafter "*Private Placements*").  That some of the investors may not have technically met the requirements is not determinative.  17 C.F.R. § 203.508(a); *Private Placements*, 66 Bus. Law. at 111.  Moreover, the Debtor subsequently obtained follow-up documentation from the investors,[12] and this information has been made available to counsel for Crossroads during discovery in the State Court Litigation.[13]

50.    For purposes of this Motion, it should be sufficient that Saranac and the Debtor substantially performed their obligations under the Operating Agreement and the Private Placement Memorandum.  Indeed, in assessing whether a motion to dismiss a petition for lack of authority should be granted, the court need not insist on the precise observance of corporate formalities, when it would be inequitable to do so.  *Windels Marx Lane & Mittendorf, LLP v. Source Enters, Inc. (In re Source Enters., Inc.)*, 392 B.R. 541, 554 (S.D.N.Y. 2008); *Am. Globus Corp.*, 195 B.R. at 265-66.  This is especially so, when the person seeking dismissal of the case would obtain an unfair advantage, such as retaining a preferential transfer, as discussed below.  *Am. Globus Corp.*, 195 B.R. at 266.  A potentially larger unfair advantage would be the continuing drain on the Debtor's resources by having to advance Crossroads' legal expenses in the State Court Litigation, now estimated at $950,000.  This continuing drain on the Debtor's cash was one of the precipitating factors of the chapter 11 filing.

51.    As set forth above, the Debtor does not have the burden to establish the qualifications of all the new Members, especially since this information is confidential, personal

---

[12] For investors demonstrating satisfaction of the income test, the proof is easy – federal tax forms, such as W-2's, K-1's and 1099's, are typically supplied.  For investors relying on the net worth test, the proof is more difficult.  The investors must list their assets and liabilities and provide information to show that the value of their assets exceeds their liabilities by more than $1 million.

[13] The statement in paragraph 21 of the Motion, "Yet no net worth statements have ever been produced for individual investors," is at least misleading because several investors showed assets and liabilities while others provided proof of income.

*235077v3*

financial information.  Nevertheless, should the Court require such a demonstration to defeat the

Motion, the Debtor is prepared to present at an evidentiary hearing that it had adequate

authorization under the Operating Agreement to file the chapter 11 petition, based on new

Members who meet the criteria of "Accredited Investors."  It is respectfully submitted, however,

that the Court should not require such a demonstration to deny the Motion to dismiss.

52.    For the foregoing reasons, the Crossroads' Motion, to the extent it seeks dismissal

of the chapter 11 case based on lack of authority to file the petition, should be denied.[14]

**Crossroads Received an Insider Preference; Stay Relief Should Be Denied**

53.    As an alternative to the dismissal of the case, Crossroads seeks limited relief from

the automatic stay with respect to proceedings in connection with the supersedeas bond posted

by the Debtor to obtain a stay of enforcement of a State Court order requiring the Debtor to

advance Crossroads litigation costs in the State Court litigation.  The precise relief that

Crossroads seeks is not clear.  In part, Crossroads asks for stay relief so that the Appellate

Division can rule on a pending request by the Debtor for permission to appeal to the Court of

Appeals.  In the main, however, Crossroads asks for stay relief so that as soon as it is able to do

so under state law, assuming the State Court is not reversed, Crossroads can access the

supersedeas bond.  Although the Debtor does not object to the eventual lifting of the automatic

stay to permit the Appellate Division (and the Court of Appeals) to rule on the Debtor's request

for permission to appeal, the Debtor opposes such relief until the Debtor has retained appellate

---

[14] It is ironic that if Crossroads is successful in obtaining a dissolution of the Debtor, then because Crossroads is a Member, the payment of Crossroads' debts will be subordinated to the payment of all other creditors who are not Members, as provided in Operating Agreement § 13.2.1(2)-(3).  This includes the advancement of litigation costs ordered by the State Court, and the subject of the portion of the Motion that seeks limited relief from the automatic stay.  Thus, Crossroads' request is not only detrimental to the Debtor's efforts to reorganize and maximize value to increase distributions to all creditors, but it is detrimental to Crossroads' own recovery rights.

counsel.[15]  More important, the Debtor absolutely opposes the request for relief to access the

supersedeas bond, because, as set forth below, it constitutes an avoidable, (indirect) insider

preference.

54.    The elements of an insider preference are (1) a transfer of an interest of property

of the debtor, (2) to or for the benefit of a creditor, (3) on account of an antecedent debt, (4)

made while the debtor was (or was rendered) insolvent, (5) made to or for the benefit of an

insider within one year of the filing of the petition, (6) that enables the creditor to receive more

than such creditor would have received had the transfer not been made and the creditor received

a distribution on account of its debt in a liquidation under chapter 7.  11 U.S.C. § 547(b).  The

supersedeas bond obviously satisfies items (2), (3) and the within one year portion of item (5).

That Crossroads is an insider cannot seriously be doubted, because Crossroads owns more than

twenty percent of the Common membership units, which makes it an affiliate, 11 U.S.C. §

101(2); and hence an insider, *id.* § 101(31)(E).  Moreover, Crossroads also qualifies as an insider

as both a managing agent, *id.* § 101(31)(F), and an unenumerated insider, since its relationship

with the Debtor is not at arms' length.  *See In re Global Aviation Holdings Inc.*, 478 B.R. 142,

148-49 (Bankr. E.D.N.Y. 2012); *CPY Co. v. Ameriscribe Corp. (In re Chas. P, Young Co.)*, 145

B.R. 131, 136 (Bankr. S.D.N.Y. 1992).  Thus, the entirety of item (5) is established.

55.    Item (4), insolvency, requires proof, which is relatively easy to supply.  Because

the Debtor has had to write down defaulted loans originated by Crossroads, the amount of the

Debtor's liabilities exceeded the fair value of the Debtor's assets as of the date the supersedeas

bond was posted.  *See* 11 U.S.C. § 101(32)(A).   The Debtor's pro forma balance sheet as of

---

[15] The appellate counsel retained by the Debtor prepetition, Brill & Meisel, is the principal candidate under
consideration, assuming such counsel is willing to be retained.  Such counsel is eligible to be retained under 11
U.S.C. § 327(e). When appropriate appellate counsel has been retained, the Debtor will not resist the lifting of the
stay to allow the appellate process to run its course.

November 30, 2012 (Exhibit J) provides evidence of such insolvency.  When insolvency is

established as a matter of fact, item (6) is established as a matter of law, because an unsecured

creditor of an insolvent debtor automatically receives more from the transfer than from a

hypothetical chapter 7 liquidation.  *See Palmer Clay Prods. Co. v. Brown*, 297 U.S. 227, 229

(1936).

56.     The central issue, then, is item (1), whether Crossroads has received a transfer of

an interest of the Debtor in property. The Debtor admits that the bond itself is not the Debtor's

property.  Nevertheless, it has long been the case that avoidable transfers can be indirect as well

as direct.  As the Supreme Court has stated more than a century ago:

> To constitute a preference, it is not necessary that the transfer be
> made directly to the creditor.  It may be made to another for his
> benefit.  If the bankruptcy has made a transfer of his property, the
> effect of which is to enable one of his creditors to obtain a greater
> percentage of his debt than another creditor of the same class,
> circuity of arrangement will not avail to save it.

*Nat'l Bank of Newport v. Nat'l Herkimer County Bank*, 225 U.S. 178, 184 (1912).  The definition

of transfer under the Bankruptcy Act, as relied on by the Supreme Court included "every other

and different mode of disposing of or parting with property."  *Id.* (quoting Bankruptcy Act of

1898, § 1(25)).  The current definition of transfer in the Bankruptcy Code similarly embraces

"each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of

or parting with – (i) property; or (ii) an interest in property."  11 U.S.C. § 101(54)(D).  Indeed,

the concept of an avoidable, indirect transfer retains its vitality under the Bankruptcy Code.  *See*

*Kaler v. Craig (In re Craig)*, 144 F.3d 587, 591 (8th Cir. 1998) (relying on *Nat'l Bank of*

*Newport* to uphold the concept of an indirect fraudulent transfer).  In this case, the Debtor

collateralized a letter of credit at Signature Bank, which Signature Bank issued in favor of One

Beacon, which issued the supersedeas bond.  If the Debtor had simply paid Crossroads the

litigation costs awarded by the State Court and then appealed, there would be no issue that such payment constituted an insider preference.  That a circuitous route to secure such payment was employed should not yield a different result.

57.    Thus, the posting of a supersedeas bond, if all the other requirements of section 547(b) of the Bankruptcy Code are met, does constitute an avoidable, indirect preference. *Thermoview Indus., Inc. v. Clemmens*, 2008 WL 906221, at *5-6 (W.D. Ky. Mar. 31, 2008), *affirming on other grounds and reinstating* 358 B.R. 330 (Bankr. W.D. Ky. 2007).[16]  If the indirect preference is for the benefit of an insider during the insider preference period, it is avoidable as an indirect insider preference.

58.    Since the posting of the supersedeas bond is an avoidable, insider preference, Crossroads should not be granted relief from the stay to access it.  Thus, this case is distinguishable from other relief from stay supersedeas bond cases in which the issue of a preference was not raised.  *See, e.g., Johns-Manville Corp. v. Asbestos Litig. Grp. (In re Johns-Manville Corp.)*, 26 B.R. 420, 432-33 (Bankr. S.D.N.Y. 1983).

59.    As a result, the alternative relief requested by Crossroads should be denied. Access to the supersedeas bond should be denied with prejudice; permission to proceed with the Debtor's requests for leave to appeal the adverse ruling of the Appellate Division should be denied without prejudice at this time, with leave to renew when the Debtor has obtained appellate counsel.

## The Debtor Denies Crossroads' Other Factual Contentions

60.    To the extent that the Debtor has not addressed herein a factual contention by Crossroads in its Motion, the Debtor does not believe that such contention merits a specific

---

[16] The district court rejected the argument that 11 U.S.C. § 547(d) supplies the only means to recover a supersedeas bond.  2008 WL 906221 at *4-5.

response, and the Debtor denies the substance of such contention.  The Debtor reserves its right

to respond to each such contention, should the Court believe that a more specific response is

required.

**Conclusion**

61.    For all the foregoing reasons, the Debtor respectfully requests that Crossroads'

Motion (i) to dismiss the chapter 11 case under Bankruptcy Code section 1112(b), or

alternatively, (ii) for limited relief from the automatic stay, should be denied in all respects, and

that the Debtor should be granted such other and further relief as is just.

Dated:  New York, New York
        July 2, 2013

                              BECKER, GLYNN, MUFFLY,
                                CHASSIN & HOSINSKI LLP
                              299 Park Avenue, 16th Floor
                              New York, NY  10171
                              (212) 888-3033

                              By:  */s/ Alec P. Ostrow*
                                   Chester B. Salomon
                                   csalomon@beckerglynn.com
                                   Alec P. Ostrow
                                   aostrow@beckerglynn.com
                                   Michael D. Margulies
                                   mmargulies@beckerglynn.com

                              *Attorneys for Debtor and Debtor in Possession*

### Exhibit List

A – Operating Agreement – referenced in ¶ 7

B – Private Placement Memorandum – referenced in ¶ 9

C – July 16, 2010 Letter from Crossroads' Counsel – referenced in ¶ 10

D – SEC Form D – referenced in ¶ 11

E – Subscription Booklet – referenced in ¶ 11

F – Summary of Quad-C Members and Ownership – referenced in ¶ 13

G – Order and Decision of November 2, 2011 – referenced in ¶ 22

H – Debtor's Pro Forma Balance Sheet as of November 30, 2012 – referenced in ¶ 26

I – Member Meeting Notice – referenced in ¶ 29

J – Debtor's Resolutions – referenced in ¶ 31

*235077v3*