**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------x
In re:

QUAD-C FUNDING LLC,

Debtor.
-------------------------------------------------------------------x

Chapter 11

Case No. 13-11725 (ALG)

(Jointly Administered)

## MEMORANDUM OF DECISION AND ORDER

A P P E A R A N C E S:

BECKER, GLYNN, MUFFLY, CHASSIN &
HOSINSKY LLP
*Counsel for Debtor Quad-C Funding LLC*
   By:   Alec P. Ostrow, Esq.
          Chester B. Salomon, Esq.
          Michael D. Margulies, Esq.
299 Park Avenue, 16th Floor
New York, New York 10171

KENNEDY BERG LLP
*Co-Counsel for Crossroads ABL, LLC and Crossroads*
*Financial Services, LLC*
   By:   Gabriel Berg, Esq.
          Andrew A. Smith, Esq.
401 Broadway, Suite 1900
New York, New York 10013

DIAMOND McCARTHY LLP
*Co-Counsel for Crossroads ABL, LLC and Crossroads*
*Financial Services, LLC*
   By:   Richard I. Janvey, Esq.
          Howard D. Ressler, Esq.
620 Eighth Avenue, 39th Floor
New York, New York 10018

TOGUT, SEGAL & SEGAL LLP
*Counsel for Creditor Eric Teng*
  By:  Frank A. Oswald, Esq.
        Lara R. Sheikh, Esq.
One Penn Plaza, Suite 3335
New York, New York 10019


**ALLAN L. GROPPER**
**UNITED STATES BANKRUPTCY JUDGE**

      Before the Court is the motion (the "Motion") of Crossroads ABL, LLC and Crossroads Financial Services, LLC (collectively, "Crossroads"), pursuant to Bankruptcy Code § 1112(b), to dismiss the Chapter 11 petition filed by debtor Quad-C Funding LLC ("Debtor"). Crossroads is a member of the Debtor limited liability company and asserts that the vote to authorize the filing of the petition was not undertaken in accordance with the Debtor's operating agreement. Debtor and Eric Teng, who claims that he is the Debtor's principal creditor as the beneficial holder of a $7.25 million unsecured note, object to the Motion. Based on the following findings of fact and conclusions of law, the Motion is denied.

## BACKGROUND

      The following facts are taken from the parties' pleadings and affidavits, and there are no material factual disputes except where otherwise noted.

      Debtor was formed in July 2010 to provide asset-based loans to small companies. The original members of Debtor were Crossroads ABL, LLC ("Crossroads ABL") and Saranac ABL, LLC ("Saranac ABL"), special purpose entities formed, respectively, by Crossroads Financial Services, LLC ("Crossroads Financial") and Canaras Capital Management LLC ("Canaras"). Crossroads Financial believed that it could originate new loans to seed Debtor's loan portfolio, and Canaras would provide the "know-how" to manage

2

those loans. Crossroads ABL received a 40% stake in Debtor, while Saranac ABL obtained 60%, with Saranac ABL serving as Debtor's manager. Saranac ABL in turn was and is managed by Richard Levinson.

The newly-created Debtor was governed by the Limited Liability Company Operating Agreement of Quad-C Funding LLC, effective as of July 20, 2010 (the "Operating Agreement"). *See* June 13, 2013 Affirmation of Gabriel Berg ("Berg Aff."), at Exh. I. Section 6.4 of the Operating Agreement provided that certain activities could not be carried out without Supermajority approval of the holders of at least 62.5% of the common membership units, including "filing a voluntary petition by [Debtor] pursuant to Chapter 7 or Chapter 11 of the Bankruptcy Code. . . ." *Id.* at § 6.4.2; *see also id.* at § 1.80 (defining Supermajority as 62.5% of the membership units). Likewise, Supermajority approval was required to amend the Certificate of Formation or the Operating Agreement, *id.* at § 6.4.5, or to "rais[e] additional equity capital through the sale of Common Units or Preferred Units, pursuant to Section 3.3, except as provided in Section 3.3.4[.]" *Id.* at § 6.4.6. In turn, § 3.3.4 provided that:

> Notwithstanding anything to the contrary contained in Section 3.3.2, the Manager may, from time to time, after the initial Capital Contribution from the Common Members of Two Hundred Fifty Thousand Dollars ($250,000) for Two Hundred Fifty Thousand Units, in its sole discretion and without the consent of any Class, elect to raise up to an aggregate of (i) Two Hundred Thousand Dollars ($200,000) in additional equity capital for [Debtor] through the sale of Common Units, and (ii) Five Million Dollars ($5,000,000) in additional equity capital for [Debtor] through the sale of Preferred Units, in accordance with the private placement memorandum dated July 2010, as amended from time to time (the "Private Placement Memorandum") and, in connection therewith, admit one or more Common Members or Preferred Members at one or more Subsequent Closings and as consideration therefore issue Common Units or Preferred Units to such new Members. For the avoidance of doubt, the issuance of Common Units or Preferred Units at any Subsequent

3

> Closing pursuant to this Section 3.3.4 shall not be subject to the preemptive rights procedure set forth in Section 3.3.2.

*Id.* at § 3.3.4; *see also* § 3.3.2 (providing that, except as provided in § 3.3.4, if additional equity capital was raised, the existing members were required to be notified and provided with the opportunity to purchase some of the interests to be issued). There is apparently no dispute that the parties understood that this provision would allow Debtor to raise additional equity capital and thereby impair Crossroad ABL's blocking position. As Crossroads stated in a July 16, 2010 letter:

> As we understand the transaction now, with respect to Section 1.80 (Supermajority) of the Operating Agreement, more than 62.5% vote is required. Since there may be issued 50,000 more Common Units (See PPM [Private Placement Memorandum]) and an additional sale of $200,000 through the sale of Common Units (See Section 3.3.4 of the Operating Agreement), then Crossroads ABL may be diluted sufficiently that Canaras can meet the more than 62.5% voting requirement without Crossroad ABL's vote.

July 16, 2010 Letter, Docket No. 27, at Exh. C;[1] *see also* Berg Aff., at Exh. I, 7.3 ("Each Member acknowledges that, prior to the execution of this [Operating] Agreement, the Member has received a copy of . . . the Private Placement Memorandum and the Subscription Agreement attached thereto, and that the Member has examined such documents or caused such documents to be examined by the Member's representative or attorney.")

In 2010, Debtor commenced the business of making smaller-sized asset-based loans. In August 2010, it began a process of raising additional equity capital and solicited Canaras' employees and Levinson's family members for equity investments. *See* August 4, 2010

---

[1] Counsel for Debtor provided this letter and certain other pieces of documentary evidence as attachments to Debtor's opposition to the present motion without an accompanying affidavit authenticating the documents. However, Debtor has provided the July 2, 2013 Declaration of Richard Levinson ("7/2/13 Levinson Aff."), which affirms his belief that all of the facts described in Debtor's opposition are true. 7/2/13 Levinson Aff., Docket No. 28, at ¶ 3. Crossroads has not objected to the documents or otherwise asserted that they are inaccurate, and in any event, the language of the Operating Agreement clearly states that Debtor could raise additional equity capital under § 3.3.4.

4

Notice of Exempt Offerings of Securities, Docket No. 27, at Exh. D; July 15, 2013 Reply Affirmation of Gabriel Berg ("Berg Reply Aff."), at Exh. CC (August 4, 2010 email from Richard Levinson to potential investors). Crossroads ABL and Crossroads Financial did not receive notice of this equity capital raise. In accordance with the Private Placement Memorandum, any new investors were required to be "Accredited Investors" under SEC Rule 501 and thus to be eligible to purchase securities without being provided with a registration statement. Berg Aff., at Exh. M, p. 51 (Private Placement Memorandum). The term "Accredited Investors" was defined in accordance with SEC Regulations to include individuals who either had (i) a net worth above $1,000,000 (including personal residences and the net worth of the person's spouse) or (ii) income in excess of $200,000 per year in the past two years or joint income with that person's spouse of $300,000 per year. (*Id.*) Additionally, Debtor would need to have

> reasonable grounds to believe, and [the belief], immediately prior to the sale that the investor is able to bear the economic risk of this investment, and such investor has such knowledge and experience in financial and business matters that he, she or it is capable of evaluating the merits and risks of an investment in the Units. Prior to any sale of Units, [Debtor] will make all inquiries reasonably necessary, including requiring each prospective investor to complete and return a Purchaser Questionnaire, in order to substantiate that the suitability standards have been met.

*Id.*

The new investors completed Subscription Agreements representing that they either met the net worth or income requirements of an Accredited Investor. *See* Docket No. 27, at Exh. M, p. 11 (Part B – Subscriber Qualification Form). The investors were issued new Common and Preferred Units in the third quarter of 2010. *See* Docket No. 27, at Exh. F (schedule of owners of Debtor).

5

The Operating Agreement also provided Crossroads ABL with the right to dissolve Debtor within 30 days of a "Crossroads Liquidating Trigger," as defined, including Debtor's failure to have sufficient capital funding or asset-based loans by certain specified dates. Berg Aff., at Exh. I, §§ 13.1(5), 1.27.1, 1.27.2, 1.27.3, 1.27.4. On or about April 4, 2011, Saranac proposed to amend the Operating Agreement to eliminate Crossroad ABL's ability to force a dissolution of Debtor, on the ground that this would make it easier for Debtor to issue new debt and raise capital. Berg Aff., at Exh R (letter from Richard Levinson to members of Debtor describing proposed amendments to the Operating Agreement). Crossroads ABL responded to the proposal with an April 5, 2011 letter that elected to dissolve Debtor effective April 17, 2011. Berg Aff., at Exh. S. According to the letter, a Crossroads Liquidating Trigger would occur on April 17, 2011 (270 days from the date of the Operating Agreement) because Debtor would not have asset-based loans in a principal amount of at least $18,000,000 by then. *Id.*; *see also* Berg Aff., at Exh. I, 1.27.3. Notwithstanding this letter, Saranac's proposed amendments were approved without the consent of Crossroads ABL, effective April 13, 2011. *See* Berg Aff., at Exh. T (First Amendment to Operating Agreement dated April 13, 2011); *id.* at Exh. J, ¶ 16 (May 24, 2013 Declaration of Richard D. Levinson in Support of the Debtor's Chapter 11 Petition and in Accordance with Local Rule 1007-2). On April 19, 2011, Crossroads ABL sent a second letter to Saranac ABL giving notice of its election to dissolve Debtor. Berg Aff., at Exh. U. The parties strongly dispute whether the notices of dissolution and amendments to the Operating Agreement were effective.

On May 10, 2011, Crossroads Financial and Crossroads ABL sued Debtor, Canaras, Saranac ABL, and the new unit holders in state court (the "State Court Litigation") in order

6

to obtain a judicial dissolution of Debtor along with a declaratory judgment that the amendment to the Operating Agreement was invalid, and to assert claims for – among other things – breach of contract, fraud in the inducement, and tortious interference.  The State Court Litigation has been protracted, involved, and extremely expensive; Crossroads alone appears to have accrued more than $1,000,000 in legal fees to date.  As directly relevant to the instant motion, on June 22, 2011, Crossroads moved for a preliminary injunction compelling Debtor to begin winding up.  In a Decision and Order dated November 2, 2011, the State Court denied the request for a preliminary injunction:

> Having concluded that the Operating Agreement permitted the 2010 Sale of Common and Preferred Units, I must also conclude that the Plaintiff [Crossroads] is unlikely to succeed on the merits of its claim for a declaratory judgment that the 2010 Sale is void and the subsequent amendments to the Operating Agreement a nullity.

Docket No. 27, at Exh. G, p. 18.

Crossroads Financial had more success when it later moved, on February 10, 2012, to compel Debtor to advance its legal fees pursuant to the terms of a servicing agreement between Debtor, Crossroads ABL, and Saranac ABL.  In a June 11, 2012 Decision, the State Court found that the servicing agreement provided that the fees should be advanced and granted the motion.  Berg Aff., at Exh, K, p. 10.  The State Court noted that there was a possible inconsistency with its prior decision:

> I recognize that in my Decision and Order dated November 2, 2011, I concluded that Plaintiffs did not demonstrate a likelihood of success on their declaratory judgment claim, and that they were not entitled to a preliminary injunction that would act to dissolve [Debtor]. Nonetheless, this type of preliminary finding does not constitute a final determination, and these claims are still very much alive.

*Id.* at p. 10 n.7 (citations omitted).  Debtor appealed the Decision granting Crossroads' claim for advancement of its attorneys' fees to the Appellate Division, First Department and on

7

December 12, 2012 posted a $900,000 supersedeas bond (the "Bond") pending appeal.[2] In an April 25, 2013 Order, the Appellate Division upheld the June 11, 2012 Decision.[3] Berg Aff., at Exh. C.

After the appellate decision, Debtor asserts that it attempted to negotiate with Crossroads, but the attempts were not successful. Saranac ABL then issued a notice on May 20, 2013 convening a meeting of the members of Debtor on May 22, 2013 to consider the authorization of a chapter 11 filing. *See* Docket No. 27, at Exh. I (Member Meeting Notice). Even though Crossroads' goal is to wind up Debtor, and that is one of the functions of a bankruptcy case, Crossroads sent a letter dated May 21, 2013 demanding that the meeting be cancelled since "any vote held without honoring Crossroads' supermajority vote [would be] invalid because the [Debtor] unit holders, added in fall of 2011, were not accredited investors under SEC Rules and [Debtor's] Private Placement Memorandum." Berg Aff., at Exh. B.[4] At the meeting, holders of 100% of the Preferred Units and 63.5% of the Common Units – but not Crossroads ABL – voted to authorize Richard Levinson as Debtor's manager to file a chapter 11 petition. *Id.* at Exh. J (May 22, 2013 Certificate of Resolutions). According to Debtor, the likelihood that Debtor would have to advance substantial fees to Crossroads was a precipitating factor for the filing. The Debtor has also claimed that the collateralization of

---

[2] Debtor apparently obtained the Bond by providing $1,000,000 in cash as collateral for a $1,000,000 letter of credit from a bank, and the letter of credit in turn served as collateral for the Bond. According to Debtor, it was insolvent at the time the Bond was posted, although Crossroads does not accept this representation.

[3] On July 22, 2013, this Court granted Debtor limited stay relief to move to appeal that order to the New York Court of Appeals. *See* Docket No. 58, at p. 2 (Order signed July 22, 2013). This Court has otherwise stayed the State Court Litigation in order to provide the parties with a cooling off period and denied Crossroad's request to access the Bond without prejudice to renewal upon expiration of that stay. *Id.* The parties submitted a joint letter dated August 12, 2013 stating that (i) the Appellate Division had issued an order on August 6, 2013 denying Debtor's request for leave to appeal and (ii) Debtor no longer intends to seek further appeal of the order. Docket No. 67 (Joint Letter Dated August 12, 2013).

[4] This was apparently a new claim, not made previously in its submission to the State Court.

8

the appeal bond may be an avoidable preferential transfer for the benefit of Crossroads, made to an alleged insider within a year of the bankruptcy petition. *See* 11 U.S.C. § 547(b)(4)(B).

Debtor filed the present chapter 11 petition for relief on May 24, 2013. Crossroads moved to dismiss the petition on June 13, 2013. The dismissal motion is opposed by Debtor and creditor Eric Teng, as the beneficial holder of a senior subordinated unsecured note in the amount of $7,250,000, or at least 80% of the total scheduled unsecured claims against Debtor.[5] Debtor and Crossroads submitted voluminous documents in support of their positions, and the Court held a hearing on the motion on July 18, 2013.

## **DISCUSSION**

Debtor in its present guise is defunct; this may be the only thing on which the parties to this motion agree. Crossroads would apparently like to wind it up; it has already spent more than $1,000,000 trying to bring this about in the State Court and appears to be obviously willing to spend several millions more – at least if it can charge the bill to the Debtor. Debtor, which is and always has been under the control of Levinson, would apparently like to a find a way to buy out Crossroads and preserve Debtor as a functioning entity – something we call a reorganization – but it also agrees that the parties must be divorced. That is something the Bankruptcy Code can bring about, cheaply and efficiently, with due regard for the rights of creditors, who should not have to stand idly by while insiders litigate themselves into penury and destroy whatever business there was.

Nevertheless, Crossroads has moved for dismissal of this bankruptcy case pursuant to Bankruptcy Code § 1112(b) on the ground that the filing of the petition was not properly authorized. According to Crossroads, the issuance of the new Common and Preferred Units

---

[5] The only copy of the Note in the record was provided by Crossroads, and the pages have the word "VOID" printed on them. *See* Berg Reply Aff., at Exh. Z. The Court is not making factual findings regarding the terms or validity of the Note provided to the Court.

9

in 2010 was not authorized by the Private Placement Memorandum because Debtor has not met its alleged burden of showing that the new investors were "Accredited Investors," as defined. According to Crossroads, this Court must put the chapter 11 case on hold indefinitely while we attempt to locate each of the new investors, force them to disclose their income and assets and the income and assets of their spouses as of 2010, and doubtless depose them. According to Crossroads, the Court must then hold an evidentiary hearing to establish whether each of the individuals was an Accredited Investor three years ago.

In opposition, Debtor asserts that the units were issued in accordance with the Private Placement Memorandum, and further that: (i) the burden of proof is on Crossroads as the movant to show that the investors were not Accredited Investors; (ii) the State Court issued a persuasive, albeit not preclusive, decision finding that Crossroads was unlikely to succeed on the merits of its challenge to the issuance of Common and Preferred Units; and (iii) the authority to file a petition should be determined as of the date of the filing. In addition, Debtor asserts that Crossroads received an insider preference by virtue of the Bond backing up its claim for $900,000 in attorneys' fees, and this preference can be avoided only in a bankruptcy case.

The Court recognizes that the Bankruptcy Code does not establish express rules relating to authority to file a voluntary petition for relief. *See In re American Globus Corp.*, 195 B.R. 263, 265 (Bankr. S.D.N.Y. 1996). In order to determine authority to file, bankruptcy courts initially look to the state law governing the entity. *Price v. Gurney*, 324 U.S. 100, 106 (1945). In this case, Delaware law is the applicable law.[6] However, the

---

[6] Debtor is governed by Delaware state law, *see* Berg Aff., at Exh. I, § 15.10. Under the Delaware statute, a limited liability company's operating agreement specifies the rights and duties of its members and managers, including the terms under which it can be amended. *See*, *e.g.*, Del. Code. Ann. §§ 18-215, 18-302.

10

burden and type of proof necessary to make a showing of authority to file a petition are matters of federal bankruptcy law, as a court's authority to dismiss a case – if any – flows from Bankruptcy Code § 1112(b) and, further, the rights of creditors and the success of a reorganization may be at stake. *See In re Lady Madonna Indus., Inc.*, 76 B.R. 281, 287 (S.D.N.Y. 1987) ("Factors relevant to the determination of whether federal law should be applied include: the need for a uniform federal rule, the extent to which the transaction in question fits within the normal course of activities governed by state law, and the possibility of the state rule frustrating the operation of the federal statutory scheme.") (citations omitted); *In re W.R. Grace & Co.*, 475 B.R. 34, 157 (D. Del. 2012) ("Courts have routinely recognized various sections of the Bankruptcy Code as countervailing federal interests that can lawfully alter state law contract rights.").

There is conflicting case law regarding the burden on a motion to dismiss a petition for lack of authority to file. The cases alternatively hold that: (i) the burden is on the movant, *see In re ComScape Telecommunications, Inc.*, 423 B.R. 816, 830 (Bankr. S.D. Ohio 2010); *In re Player Wire Wheels, Ltd.*, 421 B.R. 864, 868-69 (Bankr. N.D. Ohio 2009); *In re H & W Food Mart, LLC*, 461 B.R. 904, 907 (Bankr. N.D. Ga. 2011); *In re S & S Liquor Mart, Inc.*, 52 B.R. 226, 228 (Bankr. R.I. 1985); *In re Penny Saver, Inc.*, 15 B.R. 252, 254 (Bankr. E.D. Pa. 1981); (ii) the burden is on the debtor, *see In re Peterson's Motor Express, Inc.*, 84 F. Supp. 230, 232 (D.N.H. 1949); or (iii) the movant has to make a *prima facie* showing, after which the burden shifts to the debtor. *See In re Real Homes, LLC*, 352 B.R. 222, 227-28 (Bankr. D. Idaho 2005); *In re Oasis at Wild Horse Ranch, LLC*, 2011 WL 45012102, *9 (9th Cir. B.A.P. Aug. 26, 2011), citing *Real Homes*, 352 B.R. at 227-28.

11

The Court is not persuaded by the cases holding that the burden should initially be on the debtor or should shift to the debtor. The filing of a bankruptcy petition by a business enterprise is designed to be a short and simple process that allows debtors to protect creditors and/or start rehabilitation immediately. There is no requirement that the debtor prove insolvency; a dispute over proof of insolvency would permit creditors and others to hold up a bankruptcy filing almost indefinitely. In enacting chapter 11, Congress intended to avoid the costly and lengthy litigation that once surrounded a filing – for example, the debtors' choice to file for Chapter X versus Chapter XI under the Bankruptcy Act. *See* Mark J. Roe, *Bankruptcy and Debtor: A New Model for Corporate Reorganization*, 83 COLUM. L. REV. 527, 570 n.148 (1983) ("Those familiar with practice under the Bankruptcy Act may be reminded that a major focal point of dispute was the question of which of the Act's two distinctive reorganization mechanisms, chapter X or chapter XI, should be used in the reorganization then at hand."); *see also* H.R. REP. NO. 595, 95th Cong., 1st Sess. 223 (1977).

Placing the burden of proof on the debtor on a motion to dismiss a filing would invariably allow any party in interest to force a debtor to expend its diminished resources litigating over the issue whether it could seek to rehabilitate or liquidate itself in an orderly fashion under the auspices of the Bankruptcy Code. As the Court said in *ComScape Telecommunications*: "Because the Court does not take the issue of dismissal lightly, the Court will place the burden of proof entirely on the Movants to demonstrate by a preponderance of the evidence that the Debtors' bankruptcy cases were unauthorized." *ComScape Telecommunications*, 423 B.R. at 830. Moreover, although the movant in a case like this does not want the bankruptcy case to proceed, it is the party seeking relief. *See S &*

12

*S Liquor Mart*, 52 B.R. at 228 ("The party objecting to the filing of a bankruptcy petition, as any moving party in civil litigation, has the burden of proving its allegations. . . .")

The Court finds the record adequate to sustain the petition and on that record finds that Crossroads has not sustained its burden to justify the relief it seeks. There is no question that Debtor is and has been controlled by the current management and that the filing is not the usurpation of authority by minority equity holders. There is similarly no issue that there was a board resolution adopted by at least 63.5% of the individuals and entities who have held membership interests since 2010. The validity of the issuance of the new membership units has been argued before the State Court, which rejected Crossroads' arguments on its motion for a preliminary injunction and found that Crossroads had not shown a substantial likelihood of success on the merits on this issue.

On this motion, Crossroads has purported to raise an additional issue that it did not even bother to raise in the initial State Court litigation – whether the individuals who bought the shares which diluted Crossroads were "Accredited Investors." The record shows that Debtor's management went through the appropriate and customary steps for verifying that the individuals were Accredited Investors. These individuals have held their interests since 2010, and the record indicates that Crossroads learned of the sale of interests by 2011, at the latest. The parties have not cited any state authority that would permit a minority shareholder to challenge a corporate action on such technical grounds years after the fact.

In any event, additional investigation of this collateral issue would be wrong as a matter of federal policy because it would permit parties to obstruct a bankruptcy filing, damage creditor interests, possibly doom a chance at rehabilitation, and possibly allow a creditor to escape liability on a potential preference. As the Court said in *American Globus*,

13

where an alleged preference was also involved, "[D]ismissal of a bankruptcy proceeding, for non-compliance with corporate bylaws or state law upon the motion of a stockholder who holds what otherwise might be a preferential transfer, would be unjustified in both law and equity." *Am. Globus*, 195 B.R. at 266 (quotation and citation omitted). Chief Judge Brozman specifically noted there that "the determination as to whether to honor corporate formalities is an equitable one, and courts should not sanction 'a perversion of the privilege to do business in a corporate form.'" *Am. Globus*, 195 B.R. at 265, quoting *Data Probe, Inc. v. 575 Computer Services, Inc.*¸ 340 N.Y.S.2d 56, 61 (Civ.Ct. N.Y.Cty. 1972), which in turn quoted *Berkey v. Third Ave. Ry. Co.*, 244 N.Y. 84, 95, 155 N.E. 58 (1926) (applying New York law). Moreover, in this case, the controverted fact – whether the investors were "Accredited Investors" – existed for the purpose of complying with the securities laws, an issue extraneous to the propriety of a bankruptcy filing. In brief, Crossroads has failed to bear the burden of overcoming Debtor's *prima facie* case that its principal, the man who has been running the company since its inception, supported by the record holders of at least 63.5% of its Common Units, had authority to file a badly needed bankruptcy petition. Discovery and trial is unnecessary under the circumstances.

       In light of this holding, there is no need to decide the validity of clauses such as the one at bar that may, in some cases, purport to give minority equity holders a veto over a chapter 11 filing. The Court recognizes that some courts have applied – without reservation – supermajority and other clauses that are designed to impede a debtor's entry into bankruptcy. *See*, *e.g.*, *DB Capital Holdings, LLC v. Aspen HH Ventures, LLC (In re DB Capital Holdings, LLC)*, 463 B.R. 142 (10th Cir. B.A.P. 2010). These clauses would permit minority equity holders to hold a bankruptcy filing hostage even where there is no dispute

that there should be a judicial dissolution or reorganization of the debtor. The mischief of such clauses is well-illustrated by the present case: if Crossroads obtained dismissal, it might be able to continue to burden creditors with the costs of its own litigation, prevent the Debtor from engaging in legitimate business operations, and avoid the risk of a potentially meritorious preference suit against it.[7] As has been stated, "there is no reason to treat bankruptcy as a bogeyman, as a fate worse than death – even, as the majority does, as a 'penalty'. . . ." *Olympia Equipment Leasing Co. v. Western Union Telegraph Co.*, 786 F.2d 794, 802 (7th Cir. 1986) (Easterbrook, J., concurring). Whatever the validity of supermajority clauses generally, there is no reason to compound the problem by holding that the Court must investigate the authority of each member of a limited liability company to vote. This would create a whole new method of obstructing a bankruptcy filing.

## CONCLUSION

For the reasons set forth above, the motion to dismiss is denied. IT IS SO ORDERED.

Dated: New York, New York
       August 16, 2013

                                                    */s/ Allan L. Gropper*
                                                    UNITED STATES BANKRUPTCY JUDGE

---

[7] The Court makes no finding whether the preference claim has merit or if the Debtor was insolvent at the time it obtained the Bond. However, the interests of creditors are paramount in any bankruptcy case, and this is one of the purposes of the preference laws. *See In re Roblin Indus., Inc.*, 78 F.3d 30, 40 (2d Cir. 1996) ("[T]he preference provisions facilitate the prime bankruptcy policy of equality of distribution among creditors of the debtor. Any creditor that received a greater payment than others of [its] class is required to disgorge so that all may share equally."), quoting H.R. REP. NO. 595, 95th Cong., 1st Sess. 177-78 (1977).